## Catherine Roach v. Marcus Kelly, Appellant.

*Negligence—Proximate and remote cause.*

A man is answerable for the consequences of a fault only so far as the same are natural or proximate, and as may on this account be foreseen by ordinary forecast, and not for those which arise from a conjunction of his fault with other circumstances of an extraordinary nature.

*Liquor laws—Selling to intoxicated person—Death—Remote and proximate cause—Province of court and jury—Acts of May 8, 1854, and May 13, 1887.*

In an action against a saloon keeper to recover damages for the death of plaintiff's husband alleged to have been caused by the act of the defendant in furnishing liquor to the deceased while intoxicated, where the evidence shows that the deceased entered the defendant's saloon and was furnished with liquor while intoxicated; that he quarreled with a man against whom he had a grudge, and then left the saloon, and quarreled with a second man, then proceeded deliberately through a tunnel to a private lot on the opposite side of a railway, leisurely cast off his clothes, fought with his second opponent, beat him and then engaged with his first opponent, and when the police came fled from them, slipped down a steep bank he was trying to climb, fell into an open sewer hole negligently left unguarded on a private lot, and thus broke his neck, the furnishing of the liquor is so remote from the injury that there can be no recovery, and the defendant is entitled to binding instructions. The act of May 8, 1854, which declares that "any person furnishing liquor to another in violation of law shall be held civilly responsible for any injury to person or property in consequence of such furnishing," imposes no higher degree of responsibility on the liquor dealer than the common law imposes on wrongdoers.

Argued Oct. 24, 1899. Appeal, No. 36, Oct. T., 1899, by defendant, from judgment of C. P. No. 2, Allegheny Co., Oct. T., 1897, No. 1000, on verdict for plaintiff. Before Sterrett, C. J., Green, McCollum, Mitchell, Dean, Fell and Brown, JJ. Reversed.

Trespass to recover damages for the death of plaintiff's husband, alleged to have been caused by the act of defendant in furnishing liquor to the deceased while intoxicated. Before White, P. J.

The facts appear by the opinion of the Supreme Court.

The court charged in part as follows:

[In a case of this kind the burden of proof is on the plaintiff, and it must be established to the satisfaction of the jury that the death resulted from the liquor obtained at the defendant's saloon; in other words, that that must be the direct, or what in law is called the proximate cause of the death. If the death resulted from any other cause, any intervening cause, the selling of the liquor would not be the proximate cause; but there may have been several little incidents occurring, or little things occurring after the sale of the liquor, and if these are also the result of the sale of the liquor they would simply be as links in the chain of causation, and be related back to the original cause.] [7]

A saloon keeper is responsible not only for his own acts, his own personal acts, but he is responsible for the acts of his barkeeper. . . .

I may refer, gentlemen, to the language of our acts on the subject. The act of 1887, which is the general license law authorizing the courts to grant licenses to parties to sell liquor by retail, prohibits, absolutely and unqualifiedly, the sale of liquor, or giving it away, because the language is, "shall not sell or give away" liquor on an election day, or on the Sabbath day, or to a minor; and further, "to any person of known intemperate habits." That is a positive prohibition. If a man is known to be of intemperate habits ;.if that is well known and the saloon keeper knows it, he cannot sell to that man if he comes into his saloon perfectly sober. It is an utter prohibition against selling to a man of that kind. Very frequently they may say that he is sober; if he is a man of known intemperate habits they cannot sell him one glass of beer, or any other kind of liquor. The law is an absolute prohibition. Further than that, " or a person visibly affected by intoxicating liquors. "

[You have seen to-day and yesterday on the stand here the ideas of some witnesses. They all say the man showed signs that he had been drinking but yet he was not drunk.] [8]

There is not much controversy as to what occurred after these parties left the saloon. The main controversy here is as to whether the deceased got liquor in this saloon and whether he was visibly affected by intoxicating liquor at the time he got liquor, and whether the death was the result of the liquor obtained in the saloon. Those are the matters in controversy.

If you believe the testimony on the part of the plaintiff's witnesses, he was under the influence of liquor when he first came into the saloon, and he got a number of drinks there of whiskey and beer, and was very much under the influence of liquor— some of them say drunk, absolutely drunk—and it was in consequence of that that he got into this altercation and quarrel with the man in the saloon. Now, there are some witnesses for the defense who say that he was perfectly sober, although one of them, this man Pratt, a witness for the defense, says that he could see that he had been drinking when he came in. If he showed visible signs of being affected by intoxicating drinks, it would be unlawful to sell him a drink after that. The defendant says he sold him one glass of beer. His barkeeper says that he did not sell him any, and a man by the name of Murphy, who had previously been a barkeeper, said that he was not there at all. One witness said he was not certain whether he got it from the regular barkeeper or from Murphy.

[Now, gentlemen, where witnesses contradict each other, you will closely scrutinize the testimony, because what a witness says is for the jury; you will not take it from me; and the weight that you will give to any testimony is altogether for the jury—you will, therefore, closely scrutinize the testimony; the manner of a witness giving testimony on the stand; the appearance of that witness, whether he has any interest in the case. Of course the defendant is deeply interested in this case, and that is a matter to be considered by the jury as to his testimony. It is very seldom, I presume, that a saloon keeper or a bartender will admit that he violated the law.] [9]

I say you take all this into consideration, to determine whether the deceased, John Roach, got liquor in that saloon when he was visibly affected by intoxicating liquors. If he did, then that was a violation of the law. He may have got liquor elsewhere. No difference about that.

[A man may get liquor at a dozen different saloons; if one man sells him one glass of liquor when he is visibly affected by intoxicating liquors, he is responsible the same as if he had sold him all the liquor, because every one who sells liquor to contribute to his intoxication is responsible for all the consequences—every one of them.] [6]

If you find from the evidence, gentlemen, that liquor was

sold to him in that saloon, when he was visibly affected by intoxicating liquors, then you pass to the next question: Was his death the result of that liquor? Did he get into that quarrel because he was drunk or under the influence of liquor? Did everything that occurred after that relate back to that liquor? Was he under the influence of liquor all the time, so that in his quarreling and in his running or trying to escape, in consequence of being under the influence of liquor he lost his life? If so, then the liquor would be the proximate cause of his death. I may refer to the points of the defendant's counsel at this point.

Verdict and judgment for plaintiff for $5,000. Plaintiff appealed.

*Errors assigned* among others were (6–9) above instructions, quoting them.

*Clarence Burleigh,* with him *W. A. Challener,* for appellant. —In determining what is proximity of cause, the true rule is that the injury must be the natural and probable consequence of the negligence; such a consequence as, under the surrounding circumstances of the case, might and ought to have been foreseen by the wrongdoer as likely to flow from his act: West Mahanoy Twp. v. Watson, 116 Pa. 350; Ry. Co. v. Trich, 117 Pa. 390; Hoag v. R. R. Co., 85 Pa. 293; Penna. R. Co. v. Hope. 80 Pa. 373; Bradford v. Boley, 167 Pa. 512.

*W. J. Brennen,* for appellee.—Appellant was responsible if his furnishing intoxicating drink to the deceased was the proximate cause of his death; that is, that the death was the natural and probable consequence of the negligence of defendant, such a consequence as under surrounding circumstances, might and ought to have been foreseen as likely to flow from his act: Penna. R. Co. v. Kerr, 62 Pa. 353.

If appellant furnished the deceased with intoxicating drink, when visibly affected, it follows under this rule that it was an unlawful and negligent act, if he was a man of known intemperate habits or visibly affected by intoxicating drink: Fink v. Garman, 40 Pa. 95; Taylor v. Wright, 126 Pa. 617; Davies v. McKnight, 146 Pa. 610; Littell v. Young, 5 Pa. Superior Ct. 205.

The question of proximate cause where the facts are disputed is for the jury; where they are undisputed, the court may determine it: Bunting v. Hogsett, 139 Pa. 363; Hoag v. R. R. Co., 85 Pa. 293; Pass. Ry. Co. v. Trich, 117 Pa. 390.

OPINION BY MR. JUSTICE DEAN, December 30, 1899:

Kelly, the defendant, was a licensed retail liquor dealer in the city of Pittsburg. On the afternoon of June 26, 1897, between 5 and 6 o'clock, one John Roach, a man about thirty-four years of age, a puddler by trade, entered Kelly's barroom; when there he took one or more drinks of whiskey and at the time was visibly intoxicated; as to whether he was sober and as to how many drinks he took there was contradictory evidence, but the jury has found both facts against defendant, and we assume the findings to be correct. While in the barroom he met John Atkinson with whom some time before he had quarreled, and towards whom he bore ill will. The old quarrel was renewed; Kelly, fearing a disturbance, requested Roach to leave, which he did; he went out and stood on the pavement a very few minutes, then returned to the barroom and talked for some minutes with several acquaintances, then went out again to the pavement where he soon got into a war of words with one Pratt, the father-in-law of Atkinson; he soon left Pratt, and a short distance off met Butler, and told him, he, Roach, was going to have a fight; the two walked back to Pratt; then the three walked together along the street to the entrance of a tunnel under the Baltimore and Ohio Railroad; here they met George Wessel, and the four went through it to a vacant lot at the far end; on this lot was an open sewer excavation. Roach then took off his coat to fight Pratt, because of insulting epithets applied to him by Pratt when in front of the barroom; while fighting, Atkinson came on the ground and took part with his father-in-law, Pratt; then Butler took part with Roach, and fought against Atkinson; Roach defeated Pratt and then went to the help of Butler in his fight with Atkinson. By this time a noisy crowd had gathered; the police ran to quell the disturbance; it was shouted that the police were coming; the fighters and the crowd ran in different directions; three of them, one being Roach, attempted to scramble up and over the steep railroad bank; Roach tried to seize the legs of one of

those before him to help him in climbing, missed his catch and
fell back, tumbling down the steep bank into the opening for
the sewer, breaking his neck in the fall.   This was 7 o'clock,
or from thirty minutes to an hour after he had taken his last
drink of liquor at Kelly's.   The facts, as thus narrated, were
either found by the jury or are undisputed.

Roach's widow, this plaintiff, brought suit under the act of
1854 for damages occasioned by the death of her husband and
got a verdict for $5,000.   The act reads thus: " Any person
furnishing intoxicating drinks to any other person in violation
of any existing law or of the provisions of this act shall be held
civilly responsible for any injury to person or property in con-
sequence of such furnishing, and any one aggrieved may recover
full damages against such person so furnishing by action on
the case instituted in any court having jurisdiction of such
form of action in this commonwealth."   Then comes the 17th
section of the act of 1887 as follows: " It shall not be lawful
for any person with or without license to furnish by sale, gift
or otherwise to any person any spirituous, vinous, malt, or
brewed liquors on any day upon which elections are now or
hereafter may be required to be held, nor on Sunday, nor at
any time to a minor or a person of known intemperate habits,
or a person visibly affected by intoxicating drink."

If the violation of this statute by defendant was the proxi-
mate cause of the death of Roach it follows that Kelly is " civ-
illy responsible " to the party aggrieved, Mrs. Roach.

At the trial defendant's counsel requested the court to charge,
that on the undisputed facts the verdict should be for defend-
ant: but the learned judge was of the opinion that it was for
the jury to determine whether the unlawful sale of liquor was
the proximate cause of Roach's death.   His legal conclusion is
very clearly announced in this quotation from the charge: " In
a case of this kind the burden of proof is on the plaintiff, and it
must be established to the satisfaction of the jury that the death
resulted from the liquor obtained at the defendant's saloon;
in other words, that that must be the direct or what in law is
called the proximate cause of the death.   If the death resulted
from any other cause, any intervening cause, the selling of the
liquor would not be the proximate cause; but there may have
been several little incidents occurring or little things occurring

after the sale of the liquor, and if these are also the result of the sale of the liquor, they would simply be as links in the chain of causation and be related back to the original cause."

Of course defendant had but small chance for a verdict under this instruction, nor from this and other parts of the charge do we suppose the learned judge intended he should have much, for he seems to have been of opinion that the proximate cause of the death was the unlawful sale of the liquor, and he might as well have plainly said so to the jury.

There are many cases where the question of remote or proximate cause is for the jury, but this is not one of them. The facts are undisputed; deceased had an old grudge against Atkinson; when heated by liquor he revived the old quarrel; in gratification of his ill will he also picked a quarrel with Pratt, the father-in-law of the man he hated; they proceeded some distance to private property and fought; Roach defeated Pratt, then attacked Atkinson; while engaged in this second flagrant breach of the peace the cry of police is raised, and all, both the drunk and sober, fled; Roach, by the concurring circumstances of the slip on the bank and the fall into the open sewer, was killed. Admit that his resentment on account of the old grudge and his quarrelsomeness were prompted by the liquor and resulted in the fight; he received no injury in that consequence of defendant's act; the direct effect of the liquor ended with the fight; in a subsequent attempt, however, to escape arrest for a violation of law he met his death; this was an intermediate cause, disconnected from the primary one, for which, under no view of the facts, was defendant responsible. If Roach in his flight had been arrested by the officers, and in a scuffle to escape from them had met his death, it might as well have been argued the proximate cause of his death was the unlawful sale of liquor, yet it is too plain for argument that the resistance to the officers was the proximate and effective intervening cause, while at most the sale of liquor was the very remote cause. If we apply the rule laid down in Hoag *v*. R. R. Co., 85 Pa. 293, we reach the same conclusion. As is well said by PAXSON, J., in that case, " A man's responsibility for his negligence and that of his servants must end somewhere. There is a possibility of carrying an admittedly correct principle too far. It may be extended so as to reach the reductio ad ab-

surdum, so far as it applies to the practical affairs of life."
And then quoting R. R. Co. v. Hope, 80 Pa. 373, he adopts as
the safest rule, " that the injury must be the natural and prob-
able consequence of the negligence—such a consequence as
under the surrounding circumstances of the case might and
ought to have been foreseen by the wrongdoer as likely to fol-
low from his act." It is said in Morrison v. Davis & Co., 20
Pa. 171: " The general rule is that a man is answerable for the
consequences of a fault only so far as the same are natural or
proximate as may on this account be foreseen by ordinary fore-
cast, and not for those which arise from a conjunction of his fault
with other circumstances of an extraordinary nature. Thus,
a blacksmith pricks a horse by careless shoeing; ordinary fore-
sight might anticipate lameness and some days or weeks of un-
fitness for use, but it could not anticipate that by reason of the
lameness the horse would be delayed in passing through a for-
est until a tree fell and killed him or injured his rider." The
statute on which this suit is founded imposes no higher degree
of responsibility on the liquor dealer than the common law im-
poses upon wrongdoers. It declares he "shall be held civilly
responsible for any injury to person or property in consequence
of such furnishing." The criminal law imposes punishment
without regard to the consequences; the civil law damages
only for the natural and probable consequences of the act. It
might be plausibly argued that defendant ought to have so
far foreseen as the natural and probable consequences of his
act, that Roach might have a deadly fall on the highway when
going to his home, or that his death might result from being
run down by cars while crossing a railroad track, or by falling
into water and drowning, or possibly by exciting his quarrel-
some disposition his death might have come from a blow in-
flicted by some insulted antagonist, but that he should quarrel
with Pratt, proceed deliberately through a tunnel to a private
lot on the opposite side of a railway, leisurely cast off his cloth-
ing, fight with Pratt and beat him, then engage with Atkinson,
then, in terror of the law which he had violated, flee from the
officers, slip down the steep bank he was striving to climb, fall
into an open sewer hole negligently unguarded on a private lot,
and thus break his neck, surely this was neither the natural nor
probable consequence of giving him drink. The alleged cause

is so remote from the injury that the learned judge ought to
have said peremptorily that there could be no recovery.

The judgment is reversed and judgment is entered for de-
fendant.